S. L. JONES & CO. *v.* UNITED STATES (No. 4364)[1]

United States Court of Customs and Patent Appeals, February 24, 1942

*Lawrence A. Harper* for appellant.

*Paul P. Rao*, Assistant Attorney General (*James F. Donnelly* and *Richard E. Weeks*, special attorneys, of counsel), for the United States.

[1] C. A. D. 194.

[Oral argument January 5, 1942, by Mr. Harper and Mr. Weeks.]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the importer from the judgment of the United States Customs Court, Third Division, denying refund of certain moneys assessed and collected by the Collector of Customs at the port of San Francisco, Calif., upon an importation of merchandise described as white hulled sesame seed.

The merchandise was classified under paragraph 1727 of the Tariff Act of 1930 and returned free of duty so far as that act was concerned, but was subjected to a tax of 1.18 cents per pound by reason of section 601 (c) of the Revenue Act of 1932 as amended by section 702 (8) (d) of the Revenue Act of 1938, reading, in part:

Sec. 702. (8) (d) [Revenue Act of 1938] * * * sesame seed, 1.18 cents per pound: * * *

The protest was directed solely to the tax so levied by reason of the revenue act, and the ultimate issue in the case is whether the merchandise was subject to such tax, the matter of classification under paragraph 1727 of the Tariff Act of 1930 not being at issue. The pertinent portion of the protest reads:

All the merchandise assessed for duty at * * * 1.18¢ per lb. under Section 702 of the Revenue Act of 1938, is free of such duty as the merchandise is not a seed having been hulled, decorticated or otherwise processed which renders it unfit for use as seed.

Counsel for the importer in an opening statement at the beginning of the taking of testimony before the trial court, said:

It is claimed that the merchandise is free of such tax or duty [so levied under the Revenue Act], on the grounds that it is not a seed, having been hulled, decorticated, or otherwise processed so that its use as a seed has been destroyed, and its character as a seed has been destroyed.

In view of the contentions made on behalf of appellant it is important to understand the nature and condition of the merchandise as imported.

It first may be said that the sesame plant is not indigenous to the United States and, so far as the record discloses, has never been grown here. The Summary of Tariff Information, 1929, vol. 2, p. 2464, compiled by the United States Tariff Commission for the use of the congressional committees in the preparation of the Tariff Act of 1930, states:

Description and uses.—Sesame seed is used principally for the extraction of the oil, which is a food oil used chiefly as a cooking and salad oil, and in oleomargarine. * * *.

Production.—Sesame seed is grown in China, East India, Java, Siam, Japan, and countries bordering the Mediterranean. No domestic production is reported.

The seed could be grown in the Southern States, but the large amount of hand labor required in harvesting makes domestic production unprofitable. The cake remaining after extraction of the oil is used as a cattle feed.

The importation here involved came from China. The record indicates that during many past years large quantities of sesame seeds have been imported from that country, particularly large quantities of unhulled seeds which have been used almost wholly for the extraction of their oil.

With respect to the hulled sesame seeds of the kind here involved, the testimony in the case is to the effect that they are not processed after importation to procure their oil, but that they are used (apparently in their imported condition) in the bakery and confectionery trades. The only reason assigned for not extracting their oil is, in substance, that it would not be commercially profitable to do so because of their high cost as compared with the cost of unhulled sesame seeds. There is no evidence that their oil-bearing properties have been destroyed or affected by the process of hulling, or decorticating, to which they have been subjected. It is, nevertheless, claimed that they have lost their character as seeds by reason of the hulling process, it being asserted that the "embryo" and the "hull or coat" have been lost, which, the brief for appellant declares, constitutes two-thirds "of the character of a seed," the other, or third element, being defined as "stored food" which is not claimed to have been lost.

Samples were introduced in evidence as Exhibits 1 and 2, Exhibit 1 being illustrative of hulled sesame seeds, and Exhibit 2 representative of unhulled sesame seeds. The unhulled seeds are of different colors, some being black, some yellow, some comparatively white and some brown. The hulled seeds are white in color and their surfaces are hard.

The record does not show the process by which the hulling of the involved seeds was accomplished. Mr. Percy C. Denroche, president of the importing company, testified that many years ago when he lived in China he was familiar with a process in which unhulled sesame seeds were soaked in water until the outer covering became somewhat soft and flexible and then placed in a bag which was manipulated in a manner that caused the wearing off of the outer covering or skin, but said "today they have a more modern method." The witness apparently was unable to testify from personal knowledge as to what the "more modern method" was, and no other evidence respecting it was introduced. Whatever it may have been, it resulted, according to the witness, in the elimination of "The outer covering, or we might call it the skin or shell."

The judge before whom the testimony was being taken inquired: "Just the same as the hull of the oats?" The witness replied: "Exactly, Your Honor."

The foregoing comprises all the material evidence relative to the decortication of the seeds by which their outer "skins" or "coats" were removed.

With respect to the alleged loss of the embryo element there is no evidence of its being physically removed from the seeds. From an inspection of Exhibits 1 and 2 and from an examination of standard authorities relative to sesame seeds, it appears that that element is the inmost part of the seed structure, and that it is surrounded by the "stored food" element which, as has been stated, is not claimed to have been "lost." There is nothing in the record which indicates that the embryo was destroyed by the removal of the outer covering.

Appellant's theory respecting the "loss" of the embryo element of the seeds appears to be predicated upon testimony to the effect that in a "germination" test made of a sample of hulled sesame seeds of the kind here involved germination took place in only a relatively small proportion of the seeds tested. It is not clear from the evidence that the sample so tested was taken from the imported seeds, but for the purpose of this case we may assume that it was. The test was made by Mr. Edmund S. McElligott, a chemist, at the instance of the importer which called him as a witness. He made the test by placing the seeds between pieces of moistened blotting paper kept at a temperature of 20 to 30° C. for a period of "approximately two weeks." While the testimony of the witness is not altogether clear, it, when taken as a whole, seems fairly to indicate that not more than 27 per centum of the particular sesame seeds which he then tested sprouted.

During his direct examination the following testimony was given:

Q. * * * When you made the germination test of the 27 per cent which sprouted would, in your opinion—the basis of your experience making tests—those sprouts indicate healthy seeds which would be good delivery for seeds?—A. No.

Q. On the basis of your experience do you know what percentage of seeds should sprout in order to constitute good delivery? Do you know?—A. Certainly; somewhere around 85, 90 per cent. I have sprouted seeds where I have gotten 100 per cent sprouts.

Q. That is the normal result of sprouting?—A. Yes.

Mr. WEEKS. What is the per cent?

Mr. HARPER. 85 to 90.

The WITNESS. 85 to 90 per cent I would say on the sesame seeds.

By Mr. HARPER.

Q. You examined the seeds which were handed to you. Those seeds were decorticated?—A. Yes.

The following is quoted from the cross-examination.

X Q. What is the basis of your opinion that a shipment of seeds or a sample of seeds which germinates only 27 per cent is not a good delivery of sesame seeds? What is the basis of that opinion?—A. Well, as a seed it should germinate 85, 90 per cent.

The foregoing evidence is lacking in definiteness as to the kind of seeds (other than those here involved) which the witness had tested.

We are unable to determine whether he was comparing his test of hulled sesame seeds with tests of other sesame seeds (hulled or unhulled), or with other varieties of seeds. So far as the record discloses he may have tested other decorticated sesame seeds and found their germination to range from 85 to 90 per centum. In any event there is nothing to indicate that he ever made tests of unhulled sesame seeds with respect to their germinating qualities, or for any other purpose, and it would seem that the most natural thing to have done under appellant's theory of the case would have been to have a test of unhulled seeds for comparison with the test of those which were hulled. For aught the record discloses, a 27 per centum germination of unnulled sesame seeds may be a fair average. It must be remembered that Mr. McElligott was only asked to make, and only made, a germination test. He was not asked to consider and, we suppose, did not consider any other of the qualities or characteristics of the seeds submitted to him for test. Neither seeds of the kind at issue nor unhulled seeds are shown ever to have been imported for use as seeds in propagating the sesame plant. The ultimate use of both types has been as seed in the common acceptance of the term "seed," but for food purposes. It may be said, incidentally, that the entry made by the importer contained a statement that the merchandise was not for seeding purposes.

The facts with reference to the nature of the imported merchandise disclosed by the record have been recited in detail because, in our opinion, the issue here involved is primarily one of fact. It may be assumed that sesame seeds might be subjected to processes which would so change their character that they would not fall within the *eo nomine* designation of sesame seeds, but, in our opinion, no such showing has been made with respect to the hulled seeds here involved. All the substance which rendered the seeds valuable for the purposes for which such seeds are used remained in them and were in them at the time of importation. The fact that their cost was enhanced over the cost of unhulled seeds to an extent which rendered it impractical as a commercial proposition to extract their oil did not affect the intrinsic character of the seeds. As was aptly said in the decision of the trial court:

There is some testimony that this sesame seed could not be used for the production of oil because it would be too expensive. Circumstances might alter that situation. We assume there is as much oil in a hulled seed as in an unhulled one. But regardless of that fact the merchandise is sesame seed and it is immaterial whether the seed is hulled or whether bakers and confectioners use it instead of oil refiners, or as to whether or not it will germinate to the degree required of certain seed when imported for forage crops.

Upon the facts recited, we are of opinion that the trial court reached the correct conclusion, and there is no occasion for reviewing the numerous authorities cited by appellant relating to questions of law,

nor is it necessary to review the legislative history appertaining to the subject matter. There is no contention that unhulled sesame seeds are not subject to the tax imposed by the revenue act cited, and we are of opinion that the act applies also to the merchandise at issue.

The judgment of the United States Customs Court is *affirmed*.